## STATE v. RALPH MARSHALL AND OTHERS.[1]

April 20, 1923.

No. 23, 368.

**Remedy for duplicity in indictment.**

1. Duplicity in an indictment must be taken advantage of by demurrer or motion to elect. That the court in the charge designated the felony intended by the assault as one of less enormity than the one named in the indictment cannot be considered prejudicial, since the offense was construed to be one denounced by and punishable under section 8632, G. S. 1913, viz. an assault with intent to commit a felony.

**Verdict not sustained by evidence.**

2. The evidence *held* not to sustain a verdict for an offense higher than assault in the third degree.

Defendants were indicted by the grand jury of Wright county charged with the crime of assault with intent carnally to know and abuse a female child under the age of 18 years, tried in the district court for that county before Giddings, J., and a jury which found them guilty as charged in the indictment. From an order denying their motion for a new trial, defendants appealed. Reversed.

*J. T. Alley* and *L. K. Sexton*, for appellants.

*Clifford L. Hilton*, Attorney General, and *James E. Markham*, Assistant Attorney General, for respondent.

HOLT, J.

The three defendants, 16, 17 and 18 years old, respectively, were indicted and convicted of an assault with intent to commit a felony, to-wit to ravish and carnally know and abuse Mary Saloneck, nearly 16 years of age. They appeal.

[1]Reported in 193 N. W. 165.

As we understand counsel, defendants claim prejudice because the court in the charge to the jury did not classify correctly the crime charged in the indictment. The court repeatedly stated it to be assault in the second degree, defined by section 8632, G. S. 1913, as an assault with intent to commit a felony, and for which the maximum penalty is five years in state's prison. The indictment described the felony intended to be rape, as defined in section 8655, for which the maximum penalty is 30 years' imprisonment. But in the charge the court generally designated it as carnal knowledge and abuse as defined in section 8656, wherein the maximum penalty is 7 years. The reasoning of defendants' complaint is that if the court had made clear that they were on trial for assault with intent to perpetrate the more heinous of the two felonies defined in the sections last referred to, the jury would have been more reluctant to find them guilty as charged in the indictment. Whether the indictment is under section 8632 or charges an attempt to perpetrate the crime denounced by section 8655, subjecting defendants to one-half the penalty therein fixed, is not presented, for if there was duplicity the remedy was either by demurrer or motion to elect under which statute the state wished to proceed. Neither was sought. But it may be suggested that the indictment does not follow the usual form if it were intended to charge an attempt to commit the crime of rape or of carnal knowledge. State v. Miller, 103 Minn. 24, 114 N. W. 88. The learned trial court could therefore not have prejudiced defendants, and was probably right, when stating that defendants were charged with assault in the second degree, that is, under section 8632, assault with intent to commit a felony.

However that may be, a majority of the court are of the opinion that the testimony does not warrant a conviction of any offense greater than assault in the third degree.

Mary Saloneck resided in the village of Atwater, Minnesota. On Saturday, June 3, 1922, she came to Buffalo to stay with Lucile Cronk, a girl friend. Both girls evidently sought the company of boys or young men, for they met two of defendants that evening, and stayed out late. Sunday afternoon, while the girls were playing on the public school grounds, the three defendants came over to

them. Bantering talk and jostling occurred. Mary separated from her companion, and in a short while sauntered west on the railroad tracks to look for flowers. She said she picked one flower. When some distance away the defendants observed her and followed. After overtaking her, she said some scuffling ensued wherein she was pushed over in a ditch, and one of the defendants held her down. She got up and defendants suggested it was too hot to walk on the railway track, and that it was better in the woods. At the right-of-way fence, she testified, one of the defendants picked her up and tossed her over into the arms of another who was on the other side, and then, after walking a short distance, she was pushed down, and there was a scrap for the possession of a stick-pin which she had taken from the coat lapel of one of the boys. At that time two other young men, who, attracted by the conduct of the crowd, had followed in a roundabout way, came up and, having heard Mary calling out "quit" several times, shouted "high there." At this, two of the defendants and the girl jumped up and ran away from the men. Afterwards the latter met Mary and told her they were constables. They testified that she looked scared and her arm showed rough handling, and that she said the boys had hugged and kissed her, but nothing more.

It thus appears that Mary and her friend were with two of the defendants for some time Saturday night and with all three Sunday afternoon for a considerable time before Mary started west on the railway track. During all this time there was talking and idle joshing between them, also after they caught up with her on the track and up to the time the other men's shout scattered them. But it is significant that Mary testified positively that not a word suggestive of any criminal desire was spoken by any one of the defendants, nor could any act of theirs be considered improper, except this which she claims occurred. In the afternoon some time before she started on her walk, she says one of them asked her for a "date" in the evening, and that while the scuffle for the pin took place the one who held her arms stuck his hands in her bosom. As to the appointment desired in the evening, even if Mary's mind was so corrupt as to infer evil intention on the part of the young man, there is no good

reason for saying he so meant. She does not really contend that the touching of her breast in the scuffle was other than accidental. Of course, she testified that she did not go willingly along into the woods, but was dragged. However, her cross-examination clearly reveals that there was no dragging or compulsion. It is also significant that when she returned to her friend's home she said nothing of a scare, but proceeded to take a nap on the lawn, and at 10 o'clock in the evening, by whistling, attracted two young men driving an automobile on the streets of Buffalo, with whom, though strangers, she and her friend went to a country dance some four or five miles away, remaining until early next morning.

We think these facts, to say nothing of the testimony of Mary's friend that the only account Mary made of her trip on the railway track was that one of the defendants tried to kiss her, but otherwise no improper conduct on the part of any of them occurred, show such a reasonable doubt of defendants' guilt of an intent to either ravish or carnally know or abuse prosecutrix that the verdict should not be permitted to stand. Mary and the defendants were all of the age when boisterous conduct thoughtlessly indulged in may lead others to suspect criminality when in reality nothing of the sort was intended. From her own story the prosecutrix could not have been impressed with the idea that she was in danger of criminal assault, and she cannot be accused of attempting to shield defendants.

As stated, a majority of the court are of the opinion that the evidence fails to show defendants guilty beyond a reasonable doubt of a higher degree of crime than assault in the third degree.

The judgment is reversed and a new trial granted.